United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 19, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-21087

_____

JUANITA DEHART,

Plaintiff - Appellant,

versus

BAKER HUGHES OILFIELD OPERATIONS, INC.; DOUG MURRAY,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas, Houston
USDC No. 4:04-CV-2233

_____

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

PER CURIAM:[*]

The question presented is whether Juanita DeHart has a viable retaliation claim against the defendants. Because we conclude that she has not established a prima facie case of retaliation, we AFFIRM the district court's summary judgment for the defendants.

I.

On April 10, 2000, Juanita DeHart, an African-American, began working as a Design Drafter in the Multilateral Engineering Group of Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"). Doug Murray hired DeHart and was her supervisor at the time.

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Beginning in October 2000 and continuing for three and a half years until Baker Hughes terminated DeHart on April 19, 2004, DeHart complained of air quality problems. DeHart's first complaints came in October 2000 when she complained about dust and the smell of fresh glue and paint from a construction area inside the building. She requested to be moved to a different area, and Baker Hughes complied. That next year, she received a favorable 2001 annual review.

In January and February 2002, DeHart took a one-month leave of absence, complaining of breathing difficulties at work. During the leave, she requested that Baker Hughes move her again and provide her with a HEPA air filter. Baker Hughes complied. Later that year, in July 2002, DeHart allegedly met with Murray's boss, Brent Emerson, and claimed racial discrimination against herself and an African-American coworker, Ron Sinnette, but according to Baker Hughes, the conversation never took place. In August 2002, DeHart's 2002 annual review was again favorable but noted strained communication between DeHart and her supervisor, Cliff Mills, stemming from her air quality problems.

In March 2003, DeHart complained about the smell of diesel fumes and requested a "Negative Ionizer Purification System" air filter, and Baker Hughes complied. Several months later, DeHart left work on May 1, 2003 to take a leave of absence, during which she saw two physicians. During her leave, Baker Hughes mailed DeHart a letter requesting information regarding her medical

2

condition, diagnosis, and workplace limitations. That same month, Baker Hughes terminated Sinnette pursuant to a work force reduction. Sinnette later filed an EEOC charge alleging discrimination, which the EEOC eventually dismissed.

DeHart returned to work on May 28 but did not stay long. On her first day back, DeHart complained about the smell of a coworker's cologne. On June 8, Murray told DeHart she would not receive a pay raise in 2003, and the next day, she left work again due to air quality problems. On June 11, Murray e-mailed DeHart at home and warned her that she would be terminated if she remained off work after June 16 without medical authorization. Nevertheless, when DeHart remained off work after June 16 without medical authorization, Baker Hughes did not terminate her. Instead, it sent her a letter requesting information about her medical condition, to which her physician responded that DeHart had "moderately severe reactive airway disease" but that the physician's testing of DeHart had been "unrevealing." DeHart returned to work on June 23.

On July 14, 2003, DeHart received her 2003 annual review. Her Performance Development Plan rated DeHart as "Development Needed" in every category in which she was rated. The accompanying written memorandum criticized DeHart for an allegedly bad attitude and allegedly poor attendance. In the meeting, Baker Hughes accused DeHart of "bad mouthing" management, which she denied. During the meeting, DeHart alluded to allegations of sex and race

3

discrimination against her, but she failed to provide evidence or details when an HR representative later asked DeHart for specific evidence and details supporting her claims.

Beginning in late July 2003, Baker Hughes denied DeHart's subsequent requests to have her workstation moved, despite requests from her physicians.

On the morning of August 15, 2003, according to DeHart, an EEOC investigator called her at home and questioned her regarding Sinnette's racial discrimination claim. According to DeHart, she promptly told Emerson about the phone call when she arrived at work that morning. Baker Hughes denies these allegations. Later that day, Baker Hughes issued DeHart a written warning for insubordination, for being argumentative, and for excessive absenteeism.

On September 2, 2003, DeHart filed an EEOC charge against Baker Hughes alleging that she received her poor 2003 annual review and the August 15 written warning in retaliation for having participated in Sinnette's EEOC investigation. DeHart met numerous times with Baker Hughes' management and HR department to discuss the alleged discrimination. On February 4, 2004, Baker Hughes dismissed her allegations as without merit, and a few weeks later on February 25, the EEOC followed suit, issuing a Dismissal and Notice of Right to DeHart.

On April 19, 2004, Baker Hughes terminated DeHart for alleged "Disruptive/Inability to work harmoniously with other employees."

4

Thereafter, in May 2004, DeHart filed suit in state court.  Baker Hughes and Murray removed the case to federal district court, which granted summary judgment for Baker Hughes and Murray.  DeHart appeals the dismissal of her retaliation claim.

## II.

The grant of summary judgment is reviewed de novo, applying the same standard as the lower court.  Gowesky v. Singing River Hosp. Sys., 321 F.3d 503, 507 (5th Cir. 2003).  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).

DeHart's retaliation claim is based on 42 U.S.C. § 2000e-3(a).[2]  To sustain a retaliation claim, the employee-plaintiff must establish a prima facie case for retaliation.  Baker v. American Airlines, Inc., 430 F.3d 750, 754 (5th Cir. 2005).  "To establish a prima facie case for retaliation, an employee must show 1) that she engaged in a protected activity; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action."  Id. (citations and internal quotations omitted).  If an employee does not establish a

_____

[2] The statute states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

5

prima facie case, we dismiss the retaliation claims as a matter of law.  See Byers v. Dallas Morning News, Inc., 209 F.3d 419, 429 (5th Cir. 2000).[3]  Here, DeHart claims three prima facie cases of retaliation.  For the following reasons, we conclude that all three fail as a matter of law.

A.

DeHart first argues that because she was "closely related to or associated with" Sinnette, she may share in Sinnette's protected activity of filing an EEOC racial discrimination charge.  This alleged protected activity, according to DeHart, is casually linked to two alleged adverse employment actions:  Baker Hughes' denial of DeHart's request for sick leave, and Baker Hughes' opening an "investigative" file against DeHart.

We need not determine whether DeHart has alleged a sufficient casual link or sufficient adverse employment actions because, as a matter of law, DeHart cannot claim Sinnette's protected activity as her own.  In Holt v. JTM Industries, Inc., 89 F.3d 1224 (5th Cir. 1996), this Court ruled that "when an individual, spouse or otherwise, has not participated 'in any manner' in conduct that is protected ..., we hold that he does not have automatic standing to

---

[3] If the employee establishes a prima facie case, the burden shifts to the employer-defendant to "state a legitimate non-retaliatory reason for its action."  Baker, 430 F.3d at 754 (citation omitted). Then, "[a]fter the employer states the reason, any presumption of retaliation drops from the case and the burden shifts back to the employee to show that the stated reason is actually a pretext for retaliation."  Id. (citations and internal quotations omitted).

sue for retaliation ... simply because his spouse has engaged in protected activity." Id. at 1227. In Lowrey v. Texas A&M University System, 117 F.3d 242 (5th Cir. 1997), this Court expounded on Holt and explained that "participation is the sine qua non for a retaliation claim." Id. at 252 n.17. Although the EEOC[4] and some courts[5] do not require personal participation, neither do they extend standing as far as DeHart urges. Accordingly, DeHart cannot claim Sinnette's protected activity. Without a protected activity, DeHart's first claim of retaliation fails.

B.

DeHart next argues that her participation in Sinnette's EEOC investigation was a protected activity casually linked to two alleged adverse employment actions: Baker Hughes' written discipline warning issued to DeHart on August 15, 2003, and the denial of a pay raise to DeHart on June 8, 2003.

---

[4] See EEOC Compliance Manual on Retaliation, Sections 8-II(B)(3)(c), 8-II(C)(3). The manual states: "The retaliation provisions of Title VII ... prohibit retaliation against someone so closely related to or associated with the person exercising his or her statutory rights that it would discourage or prevent the person from pursuing those rights." Id., Section 8-II(C)(3). The manual gives an example of a spouse, not a fellow member of an ethnic group. See id.

The EEOC disagrees with the Fifth Circuit's holding in Holt. See id. n.27.

[5] See, e.g., EEOC v. Ohio Edison Co., 7 F.3d 541, 544 (6th Cir. 1993) (plaintiff may allege relative's protected activities); Thurman v. Robertshaw Control Co., 869 F. Supp. 934, 941 (N.D. Ga. 1994) (plaintiff may allege protected activity of "close relative").

7

In determining whether an employer's actions constitute adverse employment actions, under our previous jurisprudence, we were "concerned solely with ultimate employment decisions." Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000) (citing Webb v. Cardiothoracic Surgery Assoc. of N. Texas, P.A., 139 F.3d 532, 540 (5th Cir. 1998)). In a recent opinion, however, the Supreme Court rejected our "ultimate employment decision" standard. Burlington Northern and Santa Fe Ry. Co. v. White, __ U.S. __, 126 S.Ct. 2405, 2414 (2006) ("We therefore reject the standards applied in the Courts of Appeals ... that have limited actionable retaliation to so-called 'ultimate employment decisions.'"). Under Burlington Northern, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citations and internal quotations omitted).

Here, Baker Hughes issued DeHart a written warning on August 15, 2003, allegedly for insubordination, for being argumentative, and for excessive absenteeism. Under the facts before us, we conclude that the written warning to DeHart would not "have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. In the first place, there were colorable grounds for the warning and a reasonable employee would have understood a warning under these circumstances was not necessarily indicative of a retaliatory mind-set. Furthermore, the August 15

8

written warning did not in fact dissuade a charge of discrimination, given that several weeks later on September 2, a charge was filed. Accordingly, because the written warning did not constitute an "adverse employment action," this retaliation claim fails.[6]

As to the denial of a pay raise, regardless of whether this is an adverse employment action, the casual link fails. Murray told DeHart on June 8, 2003 that she would not receive a pay raise that year. This warning occurred over two months before DeHart allegedly participated in Sinnette's EEOC investigation and supposedly told Emerson about her participation, which was on August 15. Therefore, the casual link fails, and with it, DeHart's retaliation claim.

C.

DeHart finally argues that her EEOC charge was a protected activity casually linked to her termination.[7]

Filing an EEOC charge is clearly a protected activity. Walker, 214 F.3d at 629 (citing Dollis v. Rubin, 77 F.3d 777, 781

---

[6] Because this retaliation claim fails, there is no reason for a fact-finder to resolve the factual dispute as to whether Baker Hughes knew, at the time it issued the August 15 written warning, that DeHart had participated in Sinnette's EEOC investigation.

[7] DeHart also appears to argue that the EEOC's issuance of a dismissal and right-to-sue letter is a protected activity casually linked to her termination. Her argument fails because an EEOC's issuance of a dismissal and right-to-sue letter is not a protected activity. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).

(5th Cir. 1995)).  Likewise, termination is clearly an adverse employment action, <u>id.</u>, even under the new standard articulated in <u>Burlington Northern</u>, <u>see</u> 126 S.Ct. at 2415.  The question, then, is whether a casual link existed between the two.

To determine the existence of a casual link, we look to three factors:  (1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination.  <u>Nowlin v. Resolution Trust Corp.</u>, 33 F.3d 498, 508 (5th Cir. 1994).  Regarding the temporal proximity of the protected activity and adverse employment action, "the mere fact that some adverse action is taken <u>after</u> an employee engages in some protected activity will not <u>always</u> be enough for a <u>prima</u> <u>facie</u> case."  <u>Roberson v. Alltel Info. Servs.</u>, 373 F.3d 647, 655 (5th Cir. 2004) (quoting <u>Swanson v. Gen. Servs. Admin.</u>, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997)).  Consideration of the time lapse is something for us to consider but is not itself determinative of retaliation.  <u>Shirley v. Chrysler First, Inc.</u>, 970 F.2d 39, 44 (5th Cir. 1992).  Close timing between the protected activity and adverse employment action may provide a causal link.  <u>Swanson</u>, 110 F.3d at 1188.  However, conclusions drawn from a lack of suspicious timing are less compelling than those drawn from the existence of suspicious timing.  <u>Fabela v. Socorro Indep. Sch. Dist.</u>, 329 F.3d 409, 418 n.9 (5th Cir. 2003).

10

Here, DeHart's past disciplinary record was not stellar. Her 2002 annual review noted a strained relationship between her and Mills. When she took a leave of absence in June 2003 without medical authorization, she came very close to termination, yet for reasons unclear, Baker Hughes decided to forgo Murray's explicit warning of terminating DeHart if she did not return to work or provide medical authorization for her leave by June 16. When she received her 2003 annual review, Baker Hughes listed "Development Needed" in every category for which DeHart was rated, and the accompanying written memorandum referred to her bad attitude and poor attendance. On August 15, 2003, Baker Hughes issued her a warning, charging insubordination, an argumentative attitude, and excessive absenteeism.

Furthermore, the record shows that Baker Hughes followed its usual policies and procedures in terminating DeHart. When DeHart complained repeatedly about air quality problems, Baker Hughes repeatedly accommodated her requests. Whenever DeHart took leaves of absence for alleged medical problems, Baker Hughes gave her the opportunity to respond and to support her allegations with medical support or authorization. When she complained about sex and race discrimination on July 14, 2003, Baker Hughes followed up and asked her to provide details. Each year, Baker Hughes provided DeHart with an annual review, and as problems developed, Baker Hughes discussed these problems with DeHart. Similarly, Baker Hughes provided DeHart with ample warnings, advising her during her June

11

2003 leave that she could be terminated if she did not provide medical authorization or report back to work, and, further warning her on August 15, 2003. As problems developed, Baker Hughes provided DeHart with numerous meetings to discuss the problems.

With respect to the temporal proximity between the day DeHart filed her EEOC charge, September 2, 2003, and the day Baker Hughes terminated her, April 19, 2004, some seven and a half months lapsed. In this Circuit, similar lapses of time, by themselves, have been insufficient to show a causal link. See Bell v. Bank of America, 171 Fed. Appx. 442, 444 (5th Cir. 2006) (unpublished) (seven-month lapse, by itself, did not demonstrate a causal link); Myers v. Crestone Intern., LLC, 121 Fed. Appx. 25, 28 (5th Cir. 2005) (unpublished) (three-month lapse, by itself, did not create casual link); Harvey v. Stringer, 113 Fed. Appx. 629, 631 (5th Cir. 2004) (unpublished) (ten-month lapse, by itself, did not create casual link); Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471-72 (5th Cir. 2002) (five-month lapse, by itself, did not create a casual link). In contrast, in Shirley we held that a casual link existed despite a fourteen-month lapse, but there the employee had worked for nine years without a single oral or written reprimand until she filed an EEOC charge, at which point the employer "suddenly found three so-called flagrant indiscretions or violations, which it accused this plaintiff of committing." See 970 F.2d at 44. Here, unlike Shirley, Baker Hughes gave DeHart repeated warnings before she was terminated.

12

Considering all three factors together, it is clear as a matter of law that DeHart has failed to establish a casual link between filing her EEOC charge and her termination. See Nowlin, 33 F.3d at 508. Accordingly, her final retaliation claim fails.[8]

### III.

DeHart has failed to demonstrate a prima facie case of retaliation by Baker Hughes. Accordingly, the district court's summary judgment for Baker Hughes and Murray is

AFFIRMED.

---

[8] DeHart alleges other protected activities and adverse employment actions. She does not, however, allege any casual link between them, and accordingly they are insufficient to create a prima facie case of retaliation. See Baker, 430 F.3d at 754.